✓ FILED ___ ENTERED
____ LOGGED _____ RECEIVED
cjf
2:28 pm, Jul 25 2022
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF FIVE CELLULAR PHONES AND THREE COMPUTERS CURRENTLY IN THE CUSTODY OF HSI** | **Case No.** _22-2088-ADC_____ |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, a Special Agent of Homeland Security Investigations ("HSI"), being duly sworn, deposes and states as follows:

### INTRODUCTION

1.      I submit this affidavit in support of an application for a search warrant authorizing the search of the following cellular telephones and any associated memory cards attached to the telephones:

   a.   One black iPhone: no identifiers, seized from 628 Lucia Ave, Baltimore, MD on June 3, 2022 (**SUBJECT ELECTRONIC DEVICE A**);

   b.   One blue iPhone: no identifiers, seized from 628 Lucia Ave, Baltimore, MD on June 3, 2022 (**SUBJECT ELECTRONIC DEVICE B**);

   c.   One black iPhone: no identifiers, seized from 628 Lucia Ave, Baltimore, MD on June 3, 2022 (**SUBJECT ELECTRONIC DEVICE C**);

   d.   One black iPhone: no identifiers, seized from 628 Lucia Ave, Baltimore, MD on June 3, 2022 (**SUBJECT ELECTRONIC DEVICE D**);

   e.   One black iPhone: no identifiers, seized from 628 Lucia Ave, Baltimore, MD on June 3, 2022(**SUBJECT ELECTRONIC DEVICE E**);

   f.   One Dell Model W24C Computer, 5490 AIO Series Inspirion: no visible identifiers or serial number, seized from 628 Lucia Ave, Baltimore, MD on June 3, 2022 (**SUBJECT ELECTRONIC DEVICE F**);

   g.   One Thinkpad Laptop: serial number: PF-2HPMW0, seized from 628 Lucia Ave, Baltimore, MD on June 3, 2022 (**SUBJECT ELECTRONIC DEVICE G**);

h.  One HP Pavilion Laptop: no visible identifiers or serial number, seized from 628 Lucia Ave, Baltimore, MD on June 3, 2022 (**SUBJECT ELECTRONIC DEVICE H);**

2.      The above-described devices are also described in Attachment A and referred herein as the "**SUBJECT ELECTRONIC DEVICES".**  The **SUBJECT ELECTRONIC DEVICES** are currently in the custody of Homeland Security Investigations located within the District of Maryland. The **SUBJECT ELECTRONIC DEVICES** remain in the same or substantially same condition as when they were first seized by law enforcement officers. The applied-for warrant would authorize the forensic examination of the **SUBJECT ELECTRONIC DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

3.       Based on the facts set forth in this affidavit, there is probable cause to believe that the **SUBJECT ELECTRONIC DEVICES** contain evidence of the crime of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, distribution and possession with the intent to distribute controlled substances in violation of 21 U.S.C. §  841, wire fraud in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, bank and wire fraud conspiracy in violation of 18 U.S.C. § 1349, and aggravated identity theft in violation of 18 U.S.C. § 1028A (collectively referred to as the "Target Offenses").

4.      Because I submit this affidavit for the limited purpose of establishing probable cause for the issuance of a search warrant, I have not included each fact known to me concerning this investigation. I have not, however, omitted information that would defeat a determination of probable cause.

## **AFFIANT EXPERTISE**

5.      I am currently employed by the U. S. Department of Homeland Security, Homeland

Security Investigations ("HSI"). I have been a Special Agent with HSI since June 2010 and am currently assigned to the Transnational Organized Crime group. I have personally conducted and participated in numerous investigations involving criminal activity including but not limited to controlled substance offenses, firearms violations, fraud and money laundering (including international money laundering and business email compromise schemes), bulk cash smuggling, structuring, benefit fraud, credit card fraud, and identity theft.

6.      During these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations, consensual monitoring and recording of both telephonic and non-telephonic communications, analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance, including wire interceptions. I have participated in the arrest of numerous persons for offenses involving controlled substance offenses, firearms violations, fraud, money laundering, structuring, bulk cash smuggling, benefit fraud, credit card fraud, and identity theft. I have also authored and/or executed search and seizure warrants relating to controlled substance offenses, firearms violations, money laundering, structuring, bulk cash smuggling, benefit fraud, credit card fraud, and identity theft.

7.      The facts set forth in this affidavit are known to me because of my participation in this joint investigation between HSI and the U.S. Department of Labor, Office of Inspector General ("DOL-OIG") Washington Regional Office.  I have learned of the facts set forth in this affidavit through information provided to me by other law enforcement officers and government officials, and from records, documents, and other evidence obtained during this investigation. Since this affidavit is being submitted for the limited purpose of establishing probable cause for the requested

search warrants, I have not included every fact known to me concerning this investigation, but rather only those facts that I believe are necessary to establish probable cause to believe that Target Offenses were committed, and evidence of the Target Offenses will be found within the **SUBJECT ELECTRONIC DEVICES**. References to dates, times, places, and amounts are intended to be approximate.

## BACKGROUND REGARDING FINANCIAL FRAUD INVESTIGATIONS

8.      I know from training, experience, and consultation with federal agents experienced in financial fraud investigations that individuals who engage in violations of federal fraud statutes often utilize electronic devices, or individuals may use computers and/or printers to create fraudulent documents such as fake checks, fake bank statements, or other supporting documentation. Computers, cellular telephones, and the internet may be used to facilitate the transfer and withdrawal of illicitly gained funds. Additionally, individuals who commit these violations often maintain proceeds and instrumentalities related to financial fraud at secured locations such as residences and storage lockers and in vehicles. These proceeds and instrumentalities may include, but not be limited to, cash, checks, credit cards, debit cards, card programming machines, card stamping machines, mailings related to certain government benefit programs such as unemployment insurance claims, bank statements, bank account documents, identification documents, fraudulent or fake identification documents, current cell phones, old cell phones, current computers, old computers, electronic storage media such as CDs, DVDs, Blu-Ray discs, hard drives or thumb drives, printers, ink, check paper, receipts, packages, and bill counters.

9.      I know from my training, experience, and consultation with federal agents experienced in financial fraud investigations that individuals who commit criminal violations of federal fraud statutes often use electronic means to send and receive information that may

constitute evidence of such fraud. For example, text messages, Signal messages, Telegram messages, WhatsApp messages, social media messages, and e-mails associated with those involved in fraud often contain details relevant to their fraudulent activities, including as applied to the facts of this case, information and evidence concerning bank locations, bank accounts, identities, fund transfers conducted, and other financial information.

10.     I am aware from prior investigations where I have reviewed the contents of electronic devices (pursuant to search warrant or consent) utilized by individuals involved in criminal activity that law enforcement officers were able to obtain valuable evidence of fraud schemes in various components of a cellular phone and/or computer including call logs, contact lists, text or WhatsApp messages, photos, documents, and e-mails.

## **BACKGROUND REGARDING DRUG TRAFFICKING INVESTIGATIONS**

11.     Through my training and prior experience in narcotics trafficking investigations and arrests, I am familiar with the actions, traits, habits, and terminology utilized by narcotics traffickers.  I am familiar with the ways in which drug traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct narcotics transactions.  Based on this familiarization, I know the following:

a.     Drug trafficking is an ongoing and recurring criminal activity.  As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

b.     Drug traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell.  In that regard, I know that members of one cell commonly are provided with

information only about their specific cell's criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization.

        c.      Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, to maintain contact with other conspirators.  In addition, drug traffickers will often change their cellphones following the arrest of a member of their drug trafficking organization (DTO), or at random times in order to frustrate law enforcement efforts;

        d.      Drug traffickers often place nominal control and ownership of telephones in names other than their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

        e.      The fruits and instrumentalities of criminal activity are often concealed in digital form.  Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity.  Cell phones have both digital storage capacity and digital camera capabilities.

        f.      Individuals involved in drug trafficking often use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity and sometimes take photographs of themselves and/or co-conspirators.

        g.      Individuals who possess or own handguns or other weapons and/or illegal substances frequently photograph themselves holding the handguns or other weapons and/or illegal

substances.

       h.     Photographs on a suspect's digital device sometimes show the suspects handling proceeds from drug sales/trafficking or illegal substances.

       i.     Individuals who engage in drug trafficking often use cellular telephones to communicate with co-conspirators via phone calls and text messages.

       j.     Cell phones often record the phone's historical location data.

### THE UNEMPLOYMENT INSURANCE PROCESS

12.     In general, individuals who have lost their jobs, due to no fault of their own, can be eligible to apply for and receive unemployment "UI" benefits from the state in which they were employed. The funds to make those benefit payments come primarily from a state fund comprised of regular tax payments made by state employers.

13.     Employers establish UI tax accounts by filing a registration form with their respective state government. These single registrations can cover employer obligations to multiple state agencies. When filing, the employer can elect to register for tax accounts with as many state agencies as are applicable to its business.

14.     These employer registrations contain self-reported information about the employer and its business, including the type of business, owner's name, owner's Social Security number, relevant addresses, telephone numbers, and email addresses.

15.     Following the end of each calendar year quarter, employers are required to submit wage reports that list, among other items, the individual employees who worked for the business and the amount of wages they were paid.

16.     Employers are obligated by state law to remit an unemployment tax payment to their respective state government. The amount of the tax payment is based on the amount of gross

7

wages the employer reports on the quarterly wage report. Upon receiving quarterly wage reports from employers, each state government enters the wage information into its systems.

17.     If a future claim for UI benefits is made by a former employee of a particular business, otherwise known as a claimant, the State Workforce Agency ("SWA") will reference this employer-provided wage data in determining the claimant's eligibility for benefits under state law. Thus, state governments rely on the truthfulness of quarterly wage reports submitted by the former employer/claimant to verify wages and thus the claimant's eligibility for UI benefits.

18.     SWAs administer and oversee the UI program for state residents and other people performing work activities within the state in which the UI claim was filed. The SWA for Maryland is the Maryland Department of Labor ("MD DOL"). All SWAs rely on the truthfulness and accuracy of information submitted by a claimant in order to determine the claimant's eligibility for benefits. The U.S. DOL funds administrative costs for each SWA, including MD DOL, related to the UI program.

19.     A former employee of an in-state Maryland business (and, during the COVID-19 public health emergency, a person previously self-employed in-state), who lost his or her job due to some COVID-19-related reason, had the option to contact MD DOL and submit a claim application for UI benefits. Typically, a claimant would submit an online application with MD DOL with the claimant's personal identifying information ("PII"), such as name, Social Security number, date of birth, and other information. For self-employed claimants, the claimant was required to disclose whether they were self-employed in their own business and to list their usual occupation. Pandemic-era claims asked the claimant whether or not they were scheduled to commence employment and if they did not have a job or could not reach the job as a direct result of the COVID-19 public health emergency.  The claimant could then file for weekly benefits by

certifying online that he/she was still unemployed and still eligible for benefits. An additional weekly requirement, described to the claimant both at the time of the application and in the weekly claims, was to report the amount of all forms of income received for the preceding week. All SWAs require this and they all rely on the truthfulness and accuracy of the claimant's material representations in order to determine the claimant's eligibility to receive funds for the week. Depending on the amount and source of income listed, MD DOL might reduce the weekly benefit amount or not pay at all.

20.      At relevant times during the COVID-19 pandemic, after the MD DOL processed an initial claim application, MD DOL paid UI benefits almost entirely to direct deposit accounts with Bank of America ('BOA") pursuant to BOA's contract with the state government. MD DOL would then mail a prepaid debit card to the address provided by the claimant in his or her application for benefits. MD DOL subsequently authorized the application of benefits to the debit card account and would continue to do so on a weekly basis as long as the claimant continued to file for benefits.

## OVERVIEW OF FEDERAL FUNDING FOR PANDEMIC UI PROGRAMS

21.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, signed into law on March 27, 2020, expanded states' ability to provide UI benefits for many workers impacted by the COVID-19 pandemic, including for workers who were not ordinarily eligible for unemployment benefits.

22.       For example, the CARES Act created the Pandemic Unemployment Assistance ("PUA") program, which allowed states to provide PUA to individuals who were self-employed, seeking part-time employment, or otherwise would not qualify for regular UI compensation.

23.     The CARES Act also established the Pandemic Emergency Unemployment Compensation ("PEUC") program, which covers most individuals who exhausted all rights to regular UI compensation under state or federal law and who were able to work, available for work, and actively seeking work as defined by state law. PEUC gives states the flexibility to provide UI benefits when an individual was unable to search for work because of COVID-19, including because of illness, quarantine, or movement restrictions.

24.     The CARES Act also established the Federal Pandemic Unemployment Compensation ("FPUC") program. From April 4, 2020, through July 31, 2020, FPUC allowed states to give an additional $600 per week to individuals collecting regular UI benefits, PEUC, PUA, and/or other approved UI benefit programs by the state. And from January 2021 through September 6, 2021, FPUC allowed states to provide an additional $300 per week to those same type of individuals.

25.     According to DOL, state governments paid out over $900 billion in CARES Act unemployment benefits from approximately March 1, 2020, thru September 4, 2021. The DOL estimates the states processed and paid claims totaling at least $87 billion in improper and potentially fraudulent UI benefits. DOL's oversight agency, DOL Office of Inspector General ("DOL-OIG"), the agency that is assisting in this investigation, estimates that Maryland may have paid UI more than $1.5 billion in improper and potentially fraudulent benefits.

26.     To investigate the scope of potential UI fraud, DOL-OIG issued subpoenas (hereinafter "IG subpoenas") to the state agencies that oversee and distribute unemployment insurance. The IG subpoenas requested specific data related to UI claims filed in and after March 2020. Pursuant to the IG subpoenas, MD DOL produced over 1,000,000 UI claim records. Each record contained the claimant's name, date of birth, Social Security Number, telephone number,

mailing address, email address, and the total payment for paid claims. Additionally, because Maryland's primary UI claim application method is online, MD DOL also provided the Internet Protocol (IP) address associated with the internet connection of each claimant at the time of the initial claim filing. The MDDOL data was loaded into an electronic database that allows investigators to sort and analyze the information, to identify trends indicative of fraud.

**PROBABLE CAUSE**

27.     In February 2021, HSI, the Maryland State Police ("MSP") and Baltimore Police Department ("BPD") initiated a joint investigation into drug trafficking and related violent crime in the vicinity of the intersection of 9th Street and Patapsco Avenue in Baltimore City, Maryland.

28.     During the investigation investigators identified Gavin JOHNSON as a possible suspect in the drug trafficking at 9th and Patapsco.  As detailed below, further investigation revealed JOHNSON may have been involved in UI fraud.

29.     As explained above, DOL-OIG has information from subpoenas responses (hereinafter "IG subpoenas") from the state agencies, including Maryland, that oversee and distribute unemployment insurance. The IG subpoenas requested specific data related to UI claims filed in and after March 2020.  The records from the responses to the IG subpoenas indicate that on June 17, 2020, at 12:49 a.m., a UI application submitted to MD DOL for Gavin JOHNSON was filled out online using IP address:107.1.226.41, listing 2936 Lakebrook CI, Baltimore, MD 21227 ("the Lakebrook residence") as his current address, and using 240-571-4881 as his phone number. NATONIAJONES@GMAIL.COM was the email address used for contact information in JOHNSON's application. Pictures of JOHNSON's social security card and Maryland Identification Card were scanned and uploaded during the application process. The application stated JOHNSON was a barber and his last day of employment was April 15, 2020. Someone filed

certifications that JOHNSON was not employed for the weeks of April 18, 2020, through June 14, 2020, and he was ultimately paid $996 for each week (a total of $8,964). The applicant chose in the online application to have the money deposited on a debit card, and the debit card would have been sent to the address listed on the application, here, the Lakebrook residence. Thereafter the claim continued to be certified with the same information for JOHNSON for subsequent weeks after June 14, 2020. Those claims were paid ($2,988.00). Thus, a total of $10,956 was paid out to JOHNSON.

30.     Maryland court records indicate JOHNSON was arrested for attempted murder on April 12, 2020 and was incarcerated until April 16, 2021. Therefore, JOHNSON was incarcerated on June 17, 2020, when his initial UI claim was submitted, and throughout the subsequent period when weekly certifications were made. In this instance, the application answered yes to the question of whether the claimant was scheduled to commence employment but could not or was unable to reach the job as a direct result of the COVID-19 emergency. In fact, JOHNSON, and/or the person who likely filed the claim using his PII, would have known JOHNSON's reason for unemployment was due to incarceration. This was materially false in the initial application and subsequent weekly claims for JOHNSON. MD DOL relied on these statements as truthful and accurate. I have learned that had MD DOL been appraised of that fact, the claim would have denied.

31.     On June 18, 2020, the day an unemployment application was filed under his name, at 5:37 p.m., JOHNSON made a recorded jail call to the number 240-517-4881, the number used as his phone number on the unemployment application. A woman who investigators believe to be Jatonia BENNETT answered the phone. Investigators believe it was BENNETT because she used the same phone number on her own unemployment benefits application and she is connected to

the Lakebrook residence, as described below. Approximately three minutes and 29 seconds into the call, BENNETT stated "I called your mother and asked her for your social security number because I needed it for when we move. I'm really trying to move and try and put it down on something." JOHNSON replied: "Oh alright." BENNETT then said: "I just told your mother we would split it. If she calls you just say you needed it. So if she asked you just say alright." JOHNSON replied: "What the fuck you using my shit for?" BENNETT said: "Really. I'm not gonna put nothing in your name. For when we move. I'm trying to get everything in check now. I wouldn't put anything in your name without your permission." She continued: "We supposed to be a family. Why wouldn't you be able to get me something to put in your name….We been together for how long I ain't gona change." JOHNSON responded: "If you need the number I'm gonna get to you tomorrow." BENNETT responded: "I got the number [indecipherable]." JOHNSON said: "I'm talking about [indecipherable]." BENNETT responded: "Oh alright."

32.    Based on the conversation above, I believe that BENNETT likely needed JOHNSON's social security number to fill out the unemployment application online to receive unemployment benefits on his behalf.  It also appears from the phone call that BENNETT and JOHNSON are in a romantic relationship given that they talk about being a family and putting something in JOHNSON's name.  I also listened to additional recorded jail calls between JOHNSON and BENNETT on the number ending in 4881 in June 2020 where the two talked about JOHNSON coming home and BENNETT having $6,100 in savings.

33.    An online unemployment claim was also filled out in BENNETT's name on September 27, 2020.  The same phone number from JOHNSON's claim and the number BENNETT used to talk to JOHNSON on a recorded jail call, 240-517-4881, was noted as her number on the claim.  The application indicated BENNETT lived at the Lakebrook residence and

had worked as a teacher's aide at Frederick Elementary, at Under Armor, and as a sale clerk. She also provided an email showing she resigned as the teacher's aid. Her claim was ultimately approved, and she received $2,196.  NATONIAJONES@GMAIL.COM, the same email address used for JOHNSON's application, was the email address used for contact information in BENNETT's application. BENNETT's application chose on the online form to have the money deposited on a debit card, and the debit card would have been sent to the address listed on the application, the Lakebrook residence. BENNETT used IP address: 107.1.226.36 to submit the claim (also used on twenty-three other applications, which were submitted between April 5, 2020 to September 27, 2020).

34.     An online unemployment claim was also filled out in the name of Troy WINSTON on June 27, 2020, ten days after JOHNSON's application.  WINSTON's address was noted as the 628 Lucia Ave, Baltimore, MD (hereinafter referred to as the "Lucia" address), his phone number was noted as 443-983-5165, his email address was noted as NATONIAJONES@GMAIL.COM, and the IP address used was 165.225.9.3.  On WINSTON's application, a picture of a social security card was used.  The application indicated WINSTON was a barber at an unknown location (same occupation as JOHNSON's application) and had been out of work since April 10, 2020 (five days before JOHNSON's application indicated he had been out of work).  This claim was approved, and WINSTON was paid a total of $13,221.  Indeed, The Maryland Department of Labor sent a letter on November 21, 2021, to WINSTON indicating that he was overpaid unemployment benefits in the amount of $13,221.

35.     Maryland court records indicate WINSTON was incarcerated for First Degree Assault and firearms charges (among others) on April 19, 2020 and has not been released.  Thus, on June 27, 2020, when his unemployment claim was submitted, WINSTON was incarcerated.  In

14

this instance, the application answered "yes" to the question of whether the claimant was scheduled to commence employment but could not or was unable to reach the job as a direct result of the COVID-19 emergency.  In fact, WINSTON, and/or the person who likely used his PII to fill out the claim, would have known that WINSTON's reason for unemployment was due to incarceration. This was materially false. MD DOL relied on these statements as truthful and accurate.  I have learned that had MD DOL been appraised of that fact, the claim would have denied.

36.     An online unemployment claim was also filled out in the name of Alexis Winston on May 13, 2020.  Alexis Winston's address was listed as the Lucia address, her phone number was noted as 443-883-5165 (the same as Troy WINSTON), IP Address 107.1.226.36 was used, and her email address was noted as NATONIAJONES@GMAIL.COM. The application uploaded pictures of Alexis Winston's social security number card and her Maryland Identification Card. The application stated Alexis Winston was employed by Lyons HR and Zip Dry Cleaners and had been out of work since April 17, 2020. The application also stated in a handwritten note stated: "Due to co-vid was unable to open my childcare location to make my usual income." However, this employment was not listed in the employment section of the Maryland Department of Labor form. The application was approved and paid a total of $10,128 from June 15, 2020, until September 9, 2021.  On July 19, 2021, Maryland Department of Labor sent a letter to Lucia address and advised Alexis Winston had been overpaid by $4,420.00 because she had unreported employment.

37.     An online unemployment claim was also filled out in the name of Yasmine CAPEL on July 1, 2020. CAPEL's address was noted as the Lucia address, her phone number was noted as 443-454-7699, her email address was noted as NATONIAJONES@GMAIL.COM, and IP

address 107.1.226.36 was used (the same IP address used in BENNETT and Alexis Winston's applications). The application provided pictures of CAPEL's social security card and Maryland Driver's License. The application indicated CAPEL was a Home Health Aide and had been out of work since February 6, 2020. Between July 2, 2020, and September 7, 2021, CAPEL was paid a total of $30,548.00 for her claims.

38. Seven other individuals made claims for unemployment benefits and indicated the Lucia address as their residence. Those individuals were Travon Diggs, Joseph BENNETT Jr (hereinafter referred to as "BENNETT Jr."), Keifron Butler, Gregory Washington, Daekwon McNeil, Antwan Green and Darren Willis. The claims were made between April 19, 2020, and July 1, 2020. Approximately $90,524 total was paid to individuals who filled out applications for unemployment benefits and indicated the Lucia address as their residence. After consultation with DOL-OIG, this number of claims with the same address is an indication of fraud.

39. Further, in addition to Troy WINSTON, Alexis Winston, Yasmine CAPEL, and Jatonia BENNETT, and JOHNSON, nineteen additional individuals used the email address NATONIAJONES@GMAIL.COM as their email address for unemployment benefits applications in 2020. Those individuals were Durell Davis, BENNETT Jr., Travon Diggs, Tommie Anderson, Donovan Robinson, Daekwon McNeil, Edgar Mitchell, Jykeara Bennett, Ahmad Springs, Keifron Butler, Ashley Thomas, James Cooper, Montrea Warren, Patty Oneil, Reynaldo Rawlings, Antwan Green, George Johnson, Donnell Ennels and Xavier Tates. Approximately $216,819 was paid to individuals who filled out applications for unemployment benefits and indicated NATONIAJONES@GMAIL.COM as their email address. After consultation with DOL-OIG, I believe that this number of claims for one e-mail address is an indication of fraud.

40.     Records I received from Google pursuant to a federal court order indicate that the billing address for NATONIAJONES@GMAIL.COM was updated on March 20, 2022, with the billing name as Natonia Johnson at the Lucia address.  The phone number in Google's records for the email address is 443-454-7699.  On May 10, 2022, an administrative subpoena was served on T-Mobile for 443-454-7699, and T-Mobile provided the results on May 11, 2022. According to T-Mobile records JOHNSON was the listed subscriber and provided the Lucia address as her address of record. Investigators also located JOHNSON's marriage license which showed she was married in Baltimore, Maryland on July 24, 2014, and used the maiden name of Natonia Octavia JONES.

41.     Six unemployment claims were filed using phone number 443-454-7699.  Those claims were for: Charles Johnson (received $12,204.00), Nahema Marshall (received $9,608.00), Joseph BENNETT (received $2,702.00), Betty Medley (received $12,204.00), Camya Smith (received $11,166.00) and Lorraine Day (received $23,961.00). After consultation with DOL-OIG, I believe that this number of claims using the same phone number is an indication of fraud. All of these subjects used different addresses on their applications, none being the Lucia address.

42.     Also, twenty-six people (Alexis Winston, CAPEL, Jatonia BENNETT, along with Edgar Mitchell, George Johnson, Jykeara Bennett, James Cooper, Reynaldo Rawlings, Lorraine Day, Duriel Davis, Camy Smith, Betty Medley, Xavier Tates, Ashley Thomas, Travon Diggs, George Johnson, Donnell Ennels, Xavier Tates, Ozzie Morriestte, Donnell Ennels, Tryeon Cooper, Andre Hamlin, Oliver Hare, Dakaree Johnson, Patty Oneil, and Patty Johnson) used the same IP address for their UI claims in 2020: 107.1.226.36. An IP address that was often used when the claimant noted the Lucia address as their residential address.  This number of claims using the same IP address to submit the claim is an indication of fraud and given that several claims used

17

the Lucia address as their address while also using the same IP address, that evidence of that fraud would be found in the Lucia address.

43.     In late 2021, investigators were attempting to locate Gavin JOHNSON in order to serve him with a warrant when they learned that JOHNSON was likely in a romantic relationship with Jatonia BENNETT. Investigators went to her last known address was the Lucia address and observed a vehicle registered to Natonia Johnson (BENNETT's mother).

44.     From December 2021 until April 2022, investigators observed BENNETT exit the Lucia address and a vehicle registered to CAPEL parked nearby.

45.     Maryland's case search system provides public online information about civil and criminal cases filed in Maryland state courts.  It provides in 1994 a "paternity" case was filed by Natonia JONES against Antonio Capel.  As explained above, Yasmine CAPEL is believed to have used the NATONIAJONES@GMAIL.COM email address and the Lucia address when she applied for unemployment benefits. In 1998, there was another "paternity" case between Natonia JONES and Joseph BENNETT.  And in 2008 there was a forfeiture proceeding related to a vehicle where the court ordered default judgement against Natonia JONES and Joseph BENNETT. As explained above, Jatonia BENNETT is believed to have filled out at least two unemployment benefits applications using the NATONIAJONES@GMAIL.COM email address. Based on the paternity cases, I believe that Natonia JONES is likely the mother of both CAPEL and BENNETT.

46.     As stated above, records I received from Google pursuant to a federal court order indicate that the billing address for NATONIAJONES@GMAIL.COM was updated on March 20, 2022, with the billing name as Natonia JOHNSON, and the Lucia address.  Additionally, as of May 11, 2022, the phone number 443-454-7699 (used in several of the unemployment benefits applications) is subscribed to JOHNSON.

47.     On May 20, 2022, I drove by the Lucia address and observed a Honda Accord registered to JOHNSON parked out front.

48.     The multiple unemployment benefits applications being filed within the span of a couple months by many different people using the same address (Lucia address) and many different people using the same email account (NATONIAJONES@gmail.com) (an account which is also connected to the Lucia Address through the billing address) suggest fraud.

49.     On June 1, 2022, the Honorable J. Mark Coulson of the United States District Court for the District of Maryland authorized a search warrant for the Lucia address.

## EXECUTION OF THE SEARCH WARRANT AT LUCIA AVENUE

50.     On June 3, 2022, investigators executed the search warrant at the Lucia address and recovered firearms, suspected controlled substances, evidence of UI fraud and the **SUBJECT ELECTRONIC DEVICES**.

51.      Joseph BENNETT Jr, ("BENNETT Jr") and Deshauna NEAL were found in the basement bedroom.  BENNETT Jr. claimed to be the son of Joseph BENNETT Sr. and JOHNSON; NEAL claimed to be Joseph BENNETT Jr's girlfriend.

52.     The following items were recovered in the basement bedroom: **SUBJECT ELECTRONIC DEVICE A** and **B,** a loaded, Smith and Wesson, 9mm pistol; 23 rounds of 9mm ammunition; 29.2 grams of suspected crack cocaine; 38.6 grams of suspected quinine; 18.54 kilograms of suspected marijuana (packaged in large bundles); and suspected packaging materials that matched the packaging of the marijuana.  The empty packaging materials were submitted for fingerprint analysis and fingerprints recovered from several of the packaging materials were found to match those of BENNETT Jr.

53.     Based on my training knowledge and expertise, I believe this quantity of marijuana and the way in which it was packaged are consistent with distribution of the marijuana rather than personal use.  Also found in the basement bedroom were BENNETT Jr.'s Maryland identification card, $9,102.00 and keys to a grey Infinity with license plate number 1ET2774 which was parked in front of the residence.  After being provided *Miranda* warnings, BENNETT Jr. told investigators that he would take responsibility for everything found in the basement.

54.     A picture of the marijuana recovered from the basement bedroom is provided below.



55.     A picture of **SUBJECT DEVICE A** as it was found in place is pictured below.



56.     A picture of **SUBJECT DEVICE B** as it was found in place is pictured below.



57.     Joseph BENNETT Sr. (hereinafter referred to as BENNETT Sr.) and Natonia
JOHNSON/JONES, were found in an upstairs bedroom.  **SUBJECT ELECTRONIC DEVICE
C** and **D** were found in the bedroom with JOHNSON and BENNETT Sr.  A notebook containing

handwritten lists of person's names and numbers subsequently identified as either those persons' social security numbers or Maryland unemployment claim numbers for UI claims filed in those persons' names.  The lists generally were labeled with a header "telecerts" and included dates.

58.    Below is a picture of **SUBJECT ELECTRONIC DEVICE C** as it was found in the upstairs bedroom.



59.    Below is a picture of **SUBJECT ELECTRONIC DEVICE D** as it was found in place.



60.    Yasmine CAPEL was found in a second upstairs bedroom and claimed to be JOHNSON/JONES's daughter.  As noted above, CAPEL was connected to what are suspected to be fraudulent applications for UI benefits.  **SUBJECT ELECTRONIC DEVICE E** was also found in the bedroom.  A picture of **SUBJECT ELECTRONIC DEVICE E** as it was found in place is below.



In the kitchen of the residence, investigators found **SUBJECT ELECTRONIC DEVICE F, SUBJECT ELECTRONIC DEVICE G** and **SUBJECT ELECTRONIC DEVICE H.** Investigators also recovered a second notebook containing handwritten lists of person's names and numbers subsequently identified as either those persons' social security numbers or Maryland unemployment claim numbers for UI claims filed in those persons' names.  The lists generally were labeled with a header "telecerts" and included dates.

61.    Investigators also searched a grey Infinity parked outside of the residence and recovered a significant quantity of marijuana from a bag found in the passenger compartment.  A picture of the marijuana was it was found in the car is below.





**Interview of Natonia Johnson**

62.     During the search, an entry in one of the notebooks found in JOHNSON's bedroom suggested that JOHNSON worked for an unemployment agency.  Subsequent to the search of the Lucia residence, JOHNSON waived her *Miranda* rights and submitted to a recorded interview. During the interview JOHNSON explained that she worked as a contractor for Accenture, U.S., as a home-based UI claim representative supporting the Maryland DOL UI/PUA program. JOHNSON explained she worked in this position from approximately February 2021 through August 2021.  JOHNSON further stated that beginning in or around May 2020, she began to assist people in filing Maryland UI claims, beginning with one of her daughters, then expanding to other family members, friends, and acquaintances. She estimated that she personally filed or assisted approximately 30 people in filing initial Maryland UI claims and thereafter filed weekly claim recertification or "telecerts" for many of those people. She stated that she made approximately $200 for each claim she submitted or assisted with.

63.     JOHNSON stated she did not generally bother to verify the information she was provided in support of the UI claims. She stated she used her own email account, NATONIAJONES@GMAIL.COM for many of those claims. She stated she filed a claim or assisted in filing a claim in around May/June 2020 for Gavin JOHNSON, but she did not believe the claim was approved. She was aware that Gavin JOHNSON was incarcerated around the same time.

64.     JOHNSON stated she had permission from everyone for whom she filed the UI claims and/or telecerts, to do so. Accordingly, she suggested that agents would find identity documents such as Social Security Identifiers and Maryland Driver's Licenses and/or Identification Cards on her computers/devices. Again, she stated she did not steal any of those documents or the underlying identities of the document owners.

65.     JOHNSON stated she was issued a computer by the employer, which she used to log in and work from home, processing MD UI claim applications. She indicated that the computer was one of the computers investigators recovered from the kitchen.

66.     JOHNSON denied using her staff access to the Maryland UI claim system (known as the Beacon system) to facilitate the approval or payment of any claims. However, a review of Beacon records indicated user "natonia.johnson" (believed to be JOHNSON) accessed Beacon records system to access UI claims and took affirmative action to recertify the claims over numerous weeks, backdated claims, uploaded documents and in some instances, cleared flags/holds that were in place and preventing any payments from being made.  Investigators further found evidence that JOHNSON used her insider access in 2021 to log into numerous claims she evidently filed in 2020 for various people, notably her family members; and facilitated those claims

being paid for an extended period, typically after uploading documentation constituting proof of self-employment of the claimants for 2020.

67.     Investigators found numerous documents in Beacon for several claims related to JOHNSON's friends and family which are suspected to be fictitious.   Investigators believe JOHNSON produced on one or more of her computers for the sole purpose of establishing some basis for the claimant to be eligible to continue to receive UI payments.

**Interview of Joseph Bennett Jr.**

68.     Joseph BENNETT Jr. also waived his *Miranda* rights and agreed to be interviewed by investigators.  During the interview BENNETT Jr. admitted the luggage in which the marijuana found was his luggage but denied that the marijuana belonged to him. BENNETT Jr. admitted he drove the grey Infinity to the residence but denied knowledge of the drugs recovered from the car (although he demonstrated knowledge that the drugs were found in the black bag in the car without prompting from investigators).  BENNETT Jr. did admit to sleeping in the basement the morning of the search and admitted he smelled marijuana in the room.  BENNETT Jr. also admitted that he received unemployment benefits. BENNETT Jr. stated, "I got a little bit of money like $6,000.00 from unemployment."  BENNETT Jr. admitted that he was self employed during that time and did not report his income to DOL.

<strong>CONCLUSION</strong>

69.     Based on the foregoing, I submit that there is probable cause to believe that the individuals found at the Lucia address are involved in the Target Offenses.  Moreover, I submit that there is probable cause to believe that the **SUBJECT ELECTRONIC DEVICES** belong to the individuals found at the Lucia address and have been used in furtherance of the Target Offenses.  Therefore, I submit there is probable cause to support a warrant to search the **SUBJECT**

**ELECTRONIC DEVICES** described in Attachment A, using the Search Protocol described in Attachment B and seize the items described in Attachment B which constitute evidence of the crime of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, distribution and possession with the intent to distribute controlled substances in violation of 21 U.S.C. § 841, wire fraud in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, bank and wire fraud conspiracy in violation of 18 U.S.C. § 1349, and aggravated identity theft in violation of 18 U.S.C. § 1028A.

*natt otterson*

_____

Special Agent Natt Otterson
Homeland Security Investigations

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this __11th__ day of July, 2022

*A. David Copperthite*

The Honorable A. David Copperthite
United States Magistrate Judge

28